IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| TAMMY OLSEN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:18cv124 (JAG) |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

On April 28, 2014, Tammy Olsen ("Plaintiff") applied for Social Security Disability

Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from depression,

fibromyalgia, arthritis, back and neck problems, bipolar disorder, anxiety and panic attacks, with

an alleged onset date of March 3, 2014. The Social Security Administration ("SSA") denied

Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law

Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council denied

Plaintiff's request for review, rendering the ALJ's decision as the final decision of the

Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by affording little weight to the opinion of Glen Monteiro, M.D.,

failing to account for Plaintiff's moderate limitations in concentration, persistence and pace,

failing to discuss all of the evidence related to Plaintiff's mental impairments and failing to

conduct a function-by-function analysis. (Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s

Mem.") (ECF No. 12) at 9-17.) This matter now comes before the Court for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment or in the Alternative, Motion for Remand (ECF Nos. 10, 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 13) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED.

## I.     PROCEDURAL HISTORY

On April 28, 2014, Plaintiff protectively filed an application for DIB with an alleged onset date of March 3, 2014. (R. at 200-01.) The SSA denied these claims initially on November 21, 2014, and again upon reconsideration on May 13, 2015. (R. at 97, 113.) At Plaintiff's written request, the ALJ held a hearing on January 6, 2017. (R. at 35-72, 126-27.) On February 17, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 15-29.) On December 28, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-6.)

## II.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

2

standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

## III.    THE ALJ'S DECISION

On January 6, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 35-72.) On February 17, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 15-29.)

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-29.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 3, 2014, the alleged onset date. (R. at 17.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: spine disorder, left shoulder disorder, right knee disorder, carpel tunnel syndrome, paresthesias,

obesity, depressive disorder, bipolar disorder and anxiety disorder. (R. at 17.) At step three, the ALJ found that Plaintiff did not suffer from an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work with additional limitations. (R. at 21.) Plaintiff could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps and stairs and occasionally balance, stoop, kneel, crouch, and crawl. (R. at 22.) Plaintiff could occasionally push and/or pull with the right lower extremity, frequently push and/or pull with the non-dominant left upper extremity, frequently reach with the left upper extremity, and frequently handle, finger, and feel using the bilateral upper extremities. (R. at 22.) Plaintiff could have no more than occasional exposure to work hazards. (R. at 22.) The ALJ further limited Plaintiff to performing simple, routine and repetitive tasks for two hours at a time and making simple work-related decisions. (R. at 22.) Plaintiff could make rare changes (meaning no more than ten percent) in the general nature of the work setting or work tasks to be performed. (R. at 22.) Finally, the ALJ limited Plaintiff to no more than occasional interaction with the public, co-workers and supervisors. (R. at 22.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 27.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 28-29.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 28-29.)

## IV.    ANALYSIS

Plaintiff, age forty-five at the time of this Report and Recommendation, previously worked as a community college instructor, lab manager at a doctor's office, medical assistant,

phlebotomist and a phlebotomy supervisor. (R. at 216, 222.) She applied for Social Security

Benefits, alleging disability from depression, fibromyalgia, arthritis, back and neck problems,

bipolar disorder, anxiety and panic attacks, with an alleged onset date of March 4, 2014. (R. at

220-21.) Plaintiff's appeal to this Court alleges that the ALJ erred by affording little weight to

the opinion of Dr. Monteiro, failing to account for Plaintiff's moderate limitations in

concentration, persistence and pace, failing to properly assess all of the evidence related to

Plaintiff's mental impairments and failing to conduct a function-by-function analysis. (Pl.'s

Mem. at 9-17.)   For the reasons set forth below, the ALJ erred in his decision.

### A. The ALJ Did Not Err in Assigning Little Weight to Dr. Monteiro's Opinion.

Plaintiff argues that the ALJ erred in assigning little weight to the opinion of Dr.

Monteiro and failed to sufficiently explain his reasoning for doing so. (Pl.'s Mem. at 11-13.)

Defendant responds that substantial evidence supports the ALJ's assignment of weight to Dr.

Monteiro's opinion. (Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") (ECF No.

12) at 17-18.)

During the sequential analysis, when the ALJ determines whether the claimant

experiences a medically-determinable severe impairment, or combination of impairments, that

would significantly limit the claimant's physical or mental ability to do basic work activities, the

ALJ must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. §§ 404.1512, 404.1527. When the record contains several medical opinions that are

consistent with each other, the ALJ decides based on that evidence. § 404.1527(c). If, however,

the medical opinions do not comport with each other or with other evidence, the ALJ must

evaluate the opinions and assign them respective weight to properly analyze the evidence involved. § 404.1527(c)(2)-(6), (d).

Under the regulations, an ALJ may consider only an "acceptable medical source" as a treating source that offers an opinion entitled to controlling weight. SSR 06-03p.[2] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). A treating source's opinion must be given controlling weight if medically acceptable clinical and laboratory diagnostic techniques support it, and it comports with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.[3] Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, such as when the source opines on the issue of disability (an issue reserved for the Commissioner), or when the treating source's opinion proves inconsistent with other evidence or when other evidence in the record does not strongly support the opinion. §§ 404.1527(c)(3)-(4), (d).

---

[2]      Effective March 27, 2017, the SSA rescinded SSR 06-03p. Plaintiff filed her claim on April 28, 2014, before this regulation took effect. (R. at 200-01.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[3]      Effective March 27, 2017, the SSA rescinded SSR 96-2p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon two principal factors: supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed her claim on April 28, 2014, before this regulation took effect. (R. at 200-01.) As previously stated, the Agency does not have the power to engage in retroactive rulemaking. Thus, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. § 404.1527.

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant qualifies as disabled as defined under the Act. § 404.1527(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

Additionally, the ALJ may consider the time frame of the evidence. The relevant time period spans from the alleged onset — March 3, 2014 — through the date last insured — June 30, 2017. Plaintiff must prove her disability within that time frame. 20 C.F.R. §§ 404.101(a), 404.130; *Johnson*, 434 F.3d at 655-56. While the ALJ may consider evidence created after the date last insured, the evidence must provide a link to Plaintiff's condition *before* the date last insured. *Bird*, 699 F.3d at 340-41. Evidence "not linked in any manner to the claimant's condition before her [date last insured]" has no relevance on the ALJ's determination, and the ALJ does not need to retroactively consider it. *Johnson*, 434 F.3d at 655-56.

8

Plaintiff presented to Dr. Monteiro on April 15, 2011, complaining of back and knee pain. (R. at 296-300.) Plaintiff reported that heat, ice, pain management and muscle relaxants improved her back pain, but walking longer than fifteen minutes and standing longer than thirty minutes worsened the pain. (R. at 296-97.) Plaintiff stated that she suffered from right knee problems "all her life" and that her knee pained worsened when she climbed stairs. (R. at 297.) With respect to activities of daily living, Plaintiff reported difficulty putting on socks and shoes, but she could feed and bathe herself with minimal assistance. (R. at 297.) Although Plaintiff stated that she used a walker when her pain worsened, Dr. Monteiro observed Plaintiff walk into the examination room with no assistive device and in no apparent distress. (R. at 298.)

Upon physical examination, Dr. Monteiro noted Plaintiff's mild obesity, restricted range of motion of the thoracolumbar spine, spastic pain at L4-L5, sciatica-like pain on the right side and decreased range of motion of Plaintiff's right knee, compared to the left. (R. at 298-99.) Otherwise, Plaintiff walked with a normal gait, had negative straight-leg raising test results bilaterally, good grip strength and 5/5 grip strength in the upper and lower extremities. (R. at 299.) Although Plaintiff had reduced bilateral ankle, brachioradialis and patella reflexes, she had sensation within normal limits in the lower extremities. (R. at 299.)

Dr. Monteiro diagnosed Plaintiff with chronic low back pain and chronic right knee pain. With respect to the back pain, Dr. Monteiro recommended that Plaintiff obtain new images of her back, pursue physical therapy and continue pain management, which including taking Neurontin, Percocet and Zanaflex. (R. at 299.) Notably, Dr. Monteiro reported that Plaintiff displayed "no red flags" of lower back pain, such as loss of bowel or bladder control, loss of sensation around the perineal region and night time pain. (R. at 299.) With respect to Plaintiff's knee pain, Dr. Monteiro opined that Plaintiff likely suffered from chondromalacia based on her

9

history and note from an orthopedic surgeon stating that she had this condition. (R. at 297, 299.) Again, Dr. Monteiro recommended that Plaintiff obtain new images and pursue physical therapy. (R. at 299.)

Based on that single examination, Dr. Monteiro opined that, during an eight-hour workday, Plaintiff could stand and walk for four hours, sit for four hours, and she could carry and lift five pounds occasionally and less than two pounds frequently. (R. at 300.) Plaintiff had no manipulative, visual or communicative limitations. (R. at 300.) Dr. Monteiro stated that Plaintiff would have limitations with stooping, crouching and bending. (R. at 300.) Because Plaintiff told Dr. Monteiro that she used a walker when her back pain worsened, Dr. Monteiro suggested that she may benefit from a single-point or four-point cane for additional balance and support. (R. at 300.)

### 1. The ALJ Provided Legally Sufficient Reasoning for Assigning Dr. Monteiro's Opinion Little Weight.

The ALJ assigned little weight to Dr. Monteiro's opinion and adequately explained his reasoning for doing so. (R. at 25.) First, the ALJ discounted Dr. Monteiro's opinion, because Dr. Monteiro based his opinion on a one-time examination. (R. at 25.) This reasoning comports with the regulations, which direct the ALJ to consider the length and frequency of a treating source's examination, as well as the nature and extent of the treatment relationship. (R. at 25, 297-300); § 404.1527(d)(1). The regulations also direct the ALJ to consider the extent to which a medical opinion yields support from and maintains consistency with the claimant's medical records. § 404.1527(d)(1). Accordingly, the ALJ afforded Dr. Monteiro's opinion little weight, because it lacked consistency with his own examination notes showing that Plaintiff walked with a normal gait, did not use an assistive device, could walk on her toes and heels, and perform a heel to shin walk. (R. at 25, 297-99). Moreover, the ALJ noted that Dr. Monteiro examined

Plaintiff three years before her alleged disability onset date, and that Dr. Monteiro's opinion did not comport with more recent treatment records from Virginia Commonwealth University ("VCU") Health System.  (R. at 25); § 404.1527(d)(1).

Finally, the ALJ discounted Dr. Monteiro's opinion, because he "heavily based" his opinion on Plaintiff's subjective complaints of chronic back and right knee pain.  (R. at 25.) Plaintiff argues that "the ALJ gave no clue as to how he knew this, and in any event, it is untrue."  (Pl.'s Mem. at 12.)  Contrary to Plaintiff's assertion, Dr. Monteiro's treatment notes make clear that he based his assessment on Plaintiff's self-reported history of pain, as well as his own observations and a note from Halifax Regional Hospital, dated April 14, 2010.[5]  (R. at 296-300.)

For instance, Dr. Monteiro observed "no red flags" of low back pain on examination.  (R. at 299.)  Yet, he diagnosed Plaintiff with chronic low back pain and noted Plaintiff's "longstanding history of lower back pain" in his functional assessment.  (R. at 299.)  Similarly, Dr. Monteiro observed no joint deformity or swelling in Plaintiff's right knee, but he diagnosed her with chronic right knee pain and opined that she likely had chondromalacia of the right knee, "given her history and operative note."  (R. at 299.)  Despite observing Plaintiff walk without an assistive device and appearing in no apparent distress, Dr. Monteiro opined that Plaintiff might benefit from use of a cane based on Plaintiff's statement that she used a walker when her back pain flared up.  (R. at 300.)  These statements from Dr. Monteiro's treatment notes support the ALJ's finding that Dr. Monteiro heavily relied on Plaintiff's subjective complaints.  (R. at 25, 298-99.)  Accordingly, the Court finds that the ALJ provided legally sufficient reasoning for assigning Dr. Monteiro's opinion little weight.

---

[5]    The administrative record does not contain this treatment note.

## 2.  Substantial Evidence Supports the ALJ's Decision.

Substantial evidence, including Plaintiff's medical records, testimony and reported daily activities support the ALJ's assignment of little weight to Dr. Monteiro's restrictive opinion.

On March 23, 2011, Plaintiff presented to Community Memorial Healthcenter to have scans taken of her right knee and lumbosacral spine.  (R. at 292, 294.)  Imaging of Plaintiff's right knee revealed no acute bony abnormality and minimal medial compartment joint space narrowing without significant degenerative changes.  (R. at 292.)  The scans of Plaintiff's spine likewise showed no acute bony abnormality, as well as minimal degenerative changes and straightening of normal lordosis, which treating staff opined "could be due to positioning and/or muscular spasms."  (R. at 294.)

On June 20, 2013, Plaintiff presented to Tanglewood Family Medicine, complaining of diarrhea and other viral symptoms.  (R. at 323.)  Plaintiff reported feeling weak, dizzy and lightheaded, but she made no complaints of leg or back pain.  (R. at 323.)  On August 27, 2013, Plaintiff presented to Liz Warden, N.P., at Tanglewood Family Medicine, complaining of back pain, numbness in her right leg and numbness in both feet.  (R. at 321.)  Plaintiff walked with a limp, but otherwise appeared normal.  (R. at 320.)  Plaintiff told Nurse Warden that she used a heating pad and TENS unit, which provided some pain relief.  (R. at 321.)  Nurse Warden diagnosed Plaintiff with sciatica and low back pain, and prescribed Kenalog, Prednisone, Percocet and Zanaflex.  (R. at 320.)  Nurse Warden referred Plaintiff to a physician for sciatica, degenerative disc disease and chronic back pain.  (R. at 320.)  On July 12, 2013, Paul Bailey, M.D., ordered a bone scan on Plaintiff's right shoulder, which returned unremarkable results. (R. at 334.)

12

Plaintiff returned to Dr. Bailey on September 10, 2013, complaining of constant pain in the right knee, low back and cervical spine. (R. at 319.) Plaintiff also reported experiencing numbness in her right leg and foot. (R. at 319.) On physical examination, Dr. Bailey observed that Plaintiff had a full range of motion of all limbs without pain, but a decreased range of motion in the cervical and lumbar spine. (R. at 318.) Dr. Bailey diagnosed Plaintiff with chronic pain in the cervical and lumbar spine, degenerative joint disease and degenerative disc disease. (R. at 318.) However, Dr. Bailey noted that Plaintiff's MRI "revealed nothing critical." (R. at 318.) Dr. Bailey further assessed that Plaintiff had right leg paresthesia, fatigue, insomnia, abnormal weight gain, palpitations and migraines, and he "strongly suspect[ed]" that Plaintiff suffered from depression. (R. at 318.)

On November 4, 2013, Plaintiff presented to Dr. Bailey, complaining of left shoulder pain after hitting a deer while driving. (R. at 317.) Plaintiff had a decreased range of motion in the cervical spine and left shoulder. (R. at 316.) Dr. Bailey assessed Plaintiff as having a mild whiplash injury and prescribed rest, heating the affected area and medication. (R. at 316.)

On February 4, 2014, Nurse Warden completed a physical for Plaintiff. (R. at 312.) Plaintiff complained of muscle pain, back pain and joint aches, but Nurse Warden observed no joint swelling or redness. (R. at 313.) Nurse Warden's treatment notes contain conflicting accounts of Plaintiff's physical examination results. (R. at 310, 313.) She described Plaintiff's gait and station as within normal limits, but checked another box indicating that Plaintiff walked with an unsteady gait. (R. at 310, 313.) Plaintiff experienced numbness and weakness in her extremities and tenderness in her left shoulder. (R. at 310, 313.) But Nurse Warden also checked boxes indicating that Plaintiff had a full range of motion, normal muscle strength and normal tone in the bilateral upper and lower extremities. (R. at 310.) Nurse Warden diagnosed

13

Plaintiff with hyperlipidemia, left shoulder pain, vitamin D deficiency and morbid obesity. (R. at 310.) She recommended that Plaintiff improve her diet and "slowly get back into regular exercise." (R. at 310.) On February 5, 2014, Dr. Bailey made a radiology request for images of Plaintiff's left shoulder, which yielded unremarkable results. (R. at 331.)

On March 3, 2014 (the alleged onset date), Plaintiff presented to Tanglewood Family Medicine, reporting pain in her spine and legs. (R. at 307.) Plaintiff told treatment providers that her pain began when she bent over to pick something up off the floor and experienced a back spasm. (R. at 307.) Plaintiff took Percocet the night before, but it did significantly relieve her pain. (R. at 307.) On March 10, 2014, Plaintiff returned to Tanglewood Family Medicine, complaining of severe lower back pain and back spasms after slipping on her icy front steps three days earlier. (R. at 305.) Plaintiff described feeling "pins and needles" in both her legs and buttocks. (R. at 305.) Treatment providers prescribed Prednisone, Valium, Percocet and Demerol. (R. at 302-04.) On March 24, 2014, Plaintiff continued to complain of back spasms. (R. at 303.) Plaintiff reported experiencing numbness down both her legs if she sat or stood for "a while." (R. at 303.) Plaintiff stated that she had difficulty putting on her shoes and with other personal hygiene tasks. (R. at 303.) However, she experienced some relief with pain medication, muscle relaxers and physical therapy. (R. at 303.) Plaintiff's treatment providers referred her to a neurologist and recommended that she have an MRI of the spine and continue physical therapy. (R. at 302.)

In March 2014, Plaintiff presented to Harrison Vaughn, PT, DPT, OCS, and Eric Jorde, PT, DPT, OCS, for multiple physical therapy sessions at In Touch Therapy. (R. at 354-81.) During Plaintiff's first two appointments, Vaughan and Jorde both rated Plaintiff's ability to move, bend and rotate the lumbar spine as "very restricted" and Jorde observed that Plaintiff

14

walked with a slow, abnormal and antalgic gait. (R. at 354-55, 358-59.) Plaintiff reported that

medication and her physical therapy exercises provided some pain relief. (R. at 354, 358, 361,

374.) By March 14, 2014, Plaintiff had made "significant improvement" in her range of motion,

sensation and gait. (R. at 363.) Specifically, Plaintiff's range of motion in the lumbar spine

improved from "very restricted" to "slightly restricted" and Plaintiff walked with only a

minimally antalgic gait during sessions on March 14, March 17, March 19, March 20, March 26,

March 28 and March 31. (R. at 361-62, 364-65, 367-68, 370-71, 373-74, 376-77, 379-80.)

Plaintiff reported that the following activities exacerbated her pain: cooking or cleaning,

prolonged sitting, walking, bending, riding in a car and performing phlebotomy duties at work.

(R. at 364, 370, 376.) Jorde reported that Plaintiff demonstrated "slow overall progress towards

[physical therapy] goals[.]" (R. at 378.) Both Jorde and Vaughan found Plaintiff's signs and

symptoms consistent with "a possible irreducible derangement of the lumbar spine" and

recommended that Plaintiff continue physical therapy. (R. at 381.)

On April 1, 2014, Plaintiff presented to E. Claiborne Irby, Jr., M.D., complaining of back

pain. (R. at 336.) Plaintiff told Dr. Irby that pain medication, including a Medrol Dosepack and

Valium, gave her some pain relief, but the pain worsened again when she slipped on ice the

previous month. (R. at 305, 336.) Plaintiff also stated that physical therapy provided some pain

relief. (R. at 336.) On physical examination, Plaintiff walked with a normal gait, had a good

range of motion in both her hips and knees, and displayed intact strength in her lower

extremities. (R. at 336.) Although Plaintiff displayed tenderness in her spine and demonstrated

a restricted range of motion on forward flexion, Plaintiff had intact ankle and knee jerks, intact

sensation to light touch and negative straight leg raise test results. (R. at 336.) Dr. Irby

diagnosed Plaintiff with degenerative disc disease of the lumbar spine and left sciatica. (R. at

336.) Dr. Irby also interpreted imaging of Plaintiff's lumbar spine, which showed "some narrowing at L5-S1 but no instability." (R. at 337.) Images of Plaintiff's spine taken April 10, 2014, showed mild L5-S1 central disc bulging. (R. at 338.)

Plaintiff returned to In Touch Therapy for four more physical therapy sessions with Jorde and Vaughan in April 2014. (R. at 382-93.) She continued to display a "slightly restricted" range of motion in the lumbar spine and walked with a minimally antalgic gait. (R. at 383-84, 386-87, 389-90, 392-93.) While prolonged walking, prolonged sitting, prolonged standing and flexion in standing (i.e., having to draw blood at work or shaving legs in the shower) provoked Plaintiff's pain, medication, ice, lying down and reclining helped relieve her symptoms. (R. at 383, 386, 389, 392.) Vaughan reported that Plaintiff continued to exhibit limitations in mobility and strength in the lumbar and thoracic spine, and he opined that Plaintiff's work served as "an aggravating factor in her overall symptoms, and appear[ed] to be limiting [Plaintiff's] progress." (R. at 387, 393.) Jorde noted that Plaintiff "[was] progressing slowly[.]" (R. at 384.)

On April 15, 2014, Plaintiff returned to Dr. Irby, complaining of back and left leg pain. (R. at 335.) Plaintiff reported feeling numbness and tingling in the left leg, but she denied any bowel or bladder dysfunction. (R. at 335.) On physical examination, Dr. Irby made similar findings to his April 1 examination. (R. at 336.) Plaintiff appeared well developed and well nourished, but uncomfortable. (R. at. 335.) Dr. Irby observed some tenderness in Plaintiff's spine and noted Plaintiff's limited range of motion on forward flexion. (R. at 335.) Otherwise, Plaintiff again walked with a normal gait and displayed a good range of motion in her knees and hips, intact strength in both lower extremities and intact sensation to light touch. (R. at 335.) Plaintiff's straight leg raise test returned negative results and Dr. Irby observed no edema, redness or tenderness in either lower leg. (R. at 335.) Dr. Irby assessed Plaintiff as suffering

16

from low back pain with right sciatica and explained to Plaintiff that he "[was] really not seeing much to explain [Plaintiff's] symptoms." (R. at 335.) Dr. Irby recommended that Plaintiff return to physical therapy. (R. at 335.)

On May 16, 2014, Plaintiff presented to Elaine Cole, LCSW, at Southside Community Services Board Center ("CSB"), requesting services for major depressive/bipolar disorder. (R. at 401.) Notably, Plaintiff reported no problems with activities of daily living or maintaining independent living, and Cole did not mark Plaintiff as a fall risk. (R. at 403.)

On October 26, 2014, Plaintiff presented to Community Memorial Hospital, complaining of chest pain that sometimes radiated to her back and left arm. (R. at 427, 470.) On physical examination, Plaintiff displayed normal gait and station with no calf tenderness or induration. (R. at 428, 474.) She displayed a full range of motion throughout with no evidence of weakness. (R. at 474.) Inspection of Plaintiff's back revealed no obvious deformity or tenderness. (R. at 474.) During a second physical examination later that day, Plaintiff displayed some vertebral tenderness, but she denied back pain. (R. at 486.) Plaintiff had an echocardiogram, which also revealed no unusual findings. (R. at 438.) The next day, Plaintiff presented to Bethany L. Denlinger, M.D., for a consultation regarding Plaintiff's chest pain. (R. at 479.) Plaintiff experienced joint pain, but she displayed intact muscle strength and Dr. Denlinger observed no clubbing or edema in Plaintiff's extremities. (R. at 480-81.)

On November 4, 2014, Plaintiff presented to Saeed Jadali, M.D., with the Virginia Department of Rehabilitative Services for a consultative examination. (R. at 448-53.) Plaintiff recounted her medical history and symptoms to Dr. Jadali and told him that she could not perform any cleaning, yard work or cooking, but she listed computer use as a hobby. (R. at 449.) Although Plaintiff had some difficulty climbing onto the exam table, she did not appear

17

distressed. (R. at 450.) Plaintiff walked with an antalgic gait, but Dr. Jadali observed that Plaintiff had normal reflexes, strength and sensation throughout her upper and lower extremities. (R. at 451.) Dr. Jadeli also observed no swelling, deformity, tenderness or redness in Plaintiff's joints. (R. at 451.) Plaintiff displayed a decreased range of motion in her right hip, right knee and in thoracolumbar spine, as well as swelling and tenderness in the right knee. (R. at 453.) Notably, Plaintiff displayed a normal range of motion in the cervical spine. (R. at 453.)

On December 5, 2014, Plaintiff presented to Community Memorial Hospital after experiencing a fall. (R. at 463.) Plaintiff told treating staff that she injured her left wrist and left shoulder and complained of pain and swelling. (R. at 463.) On physical examination, Plaintiff displayed a full range of motion in all extremities, which treating staff described as "grossly normal." (R. at 464-65.) Images of Plaintiff's shoulder and wrist revealed no evidence of fracture, dislocation or other abnormalities. (R. at 466-67.) On January 19, 2015, Plaintiff returned to Community Memorial Hospital, complaining of continued pain in the left wrist. (R. at 459.) On physical examination, Plaintiff denied experiencing any back pain and treating staff described Plaintiff's extremities as grossly normal, except for swelling, tenderness and limited range of motion in Plaintiff's left wrist. (R. at 461.)

The next year, on December 1, 2015, Plaintiff presented to Carlos Williams, M.D., at the VCU Health System Commonwealth Neuro Specialists ("Commonwealth Neuro Specialists"), reporting increased pain, numbness and difficulty walking. (R. at 504.) On physical examination, Plaintiff walked with an unsteady gait, displayed a decreased range of motion, decreased strength and experienced joint pain. (R. at 504.) Dr. Williams recommended that Plaintiff have a brain MRI and EMG. (R. at 505.) Plaintiff did not follow through with either recommended test due to lack of health insurance. (R. at 509.)

On October 7, 2016, Plaintiff returned to Dr. Williams, complaining of worsening pain and numbness in her joints and low back and increased difficulty walking. (R. at 509.) On physical examination, Plaintiff displayed a normal range of motion, grossly intact cranial nerves, normal sensory function and normal motor function. (R. at 512.) On October 19, 2016, Plaintiff presented to Beth K. Rubinstein, M.D., at the VCU Health System Rheumatology Center. (R. at 521.) Dr. Rubinstein diagnosed Plaintiff with fibromyalgia, though treatment notes do not show that she conducted a physical examination. (R. at 521.) On October 21, 2016, Plaintiff presented to Daniel Falcao, D.O., after experiencing a seizure. (R. at 531.) Dr. Falcao noted that Plaintiff had no mobility limitations and required minimal assistance with activities of daily living. (R. at 533.) Plaintiff's toxicology report yielded normal results, which the ALJ noted in his opinion. (R. at 25, 536.) The next day, Plaintiff had a brain MRI, which showed no evidence of intracranial abnormality. (R. at 544-45.)

Plaintiff returned to Dr. Williams on November 7, 2016, complaining of pain, numbness, paresthesia and difficulty walking. (R. at 552.) Dr. Williams noted that Plaintiff's recent EMG showed evidence of carpal tunnel syndrome, but her brain MRI revealed no abnormal findings. (R. at 552.) Dr. Bailey described Plaintiff's neurological state as "clinically stable" and attributed her complaints to complications stemming from Plaintiff's morbid obesity and arthritis. (R. at 552.) The ALJ also cited to these findings to support his decision to afford little weight to Dr. Monteiro's opinion. (R. at 25.) On physical examination, Plaintiff displayed a normal range of motion and had normal sensory function, normal motor function and grossly intact cranial nerves. (R. at 555.)

Plaintiff's longitudinal treatment record supports the ALJ's decision to afford Dr. Monteiro's opinion little weight. Although Plaintiff sometimes walked with an antalgic or

unsteady gait, physical therapy improved Plaintiff's ability to ambulate. (R. at 313, 354-55, 358-59, 361-65, 367-68, 370-71, 373-74, 376-77, 379-80, 383-84, 386-87, 389-90, 392-93, 451, 504, 506). Other treatment records described Plaintiff's gait as normal and the record stands devoid of any evidence that Plaintiff medically required an assistive walking device, which the ALJ noted in his discussion of the medical evidence. (R. at 23, 310, 335-36, 428.) Moreover, the record contains numerous instances where Plaintiff displayed a full range of motion in her upper and lower extremities and back, as well as normal strength, normal sensory functioning and normal motor function. (R. at 310, 318, 336, 474, 486, 512, 555.) These records demonstrate that Plaintiff retained a greater functional capacity than Dr. Monteiro opined and support the ALJ's assignment of little weight to his opinion.

Plaintiff's testimony and reported daily activities further contradict Dr. Monteiro's opinion. During the hearing, Plaintiff testified that she drove approximately three times per week, including to doctor appointments and the grocery store. (R. at 43.) She also drove herself to the hearing. (R. at 44.) Plaintiff used a walker during the hearing and testified that, since October 2016, she used a walker "all the time." (R. at 40, 48.) Before October 2016, Plaintiff stated that used a cane "almost all the time." (R. at 48-49.) When the ALJ noted that Plaintiff's medical records rarely reflected use of an assistive walking device, Plaintiff admitted that she had "really good days and . . . really bad days[,]" and on the good days, she could manage without a cane. (R. at 51-53.) The ALJ afforded Plaintiff the opportunity to submit additional treatment records showing that she medically required an assistive walking device, but Plaintiff failed to submit any such records. (R. at 23, 51-52.) According to Plaintiff's adult function report, she could shower, brush her teeth, dress herself, attend church, watch television, prepare simple meals and manage her own finances — though she needed reminders when bills were

due. (R. at 244-48.) And the ALJ appropriately noted that, "despite allegations of disabling symptoms, the record shows that [Plaintiff] is able to maintain independent living with minimal assistance." (R. at 24.)

Ultimately, Plaintiff's treatment records, coupled with her testimony and reported daily activities, demonstrate that she retained a greater functional capacity than Dr. Monteiro opined. Thus, substantial evidence supports the ALJ's assignment of weight.

### B. The ALJ Properly Accounted for Plaintiff's Moderate Limitations in Concentration, Persistence and Pace.

Relying on *Mascio*, Plaintiff next argues that the ALJ's hypothetical and corresponding RFC did not appropriately account for Plaintiff's moderate limitations in concentration, persistence and pace. (Pl.'s Mem. at 14-17.) In *Mascio*, the Fourth Circuit stressed the distinction between the ability to perform simple tasks and the ability to stay on task. 780 F.3d at 638. Only an RFC assessment that includes the latter limitation sufficiently reflects a claimant's difficulties with concentration, persistence and pace. *Id.* Defendant argues that this case is distinguishable from *Mascio*, because the ALJ sufficiently accounted for Plaintiff's moderate limitations in concentration, persistence and pace, and explained why those limitations did not translate into additional limitations in Plaintiff's RFC. (Def.'s Mem. at 20-21.)

After step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1502(e)-(t), 404.1545(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of a claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, the claimant shoulders the responsibility for providing the evidence that the ALJ utilizes in making his RFC determination; however, before determining

that a claimant does not have a disability, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments based on the claimant's credible complaints. *Carter v. Astrue,* 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 404.1545(e).

Social Security Ruling 96-8p instructs that the RFC "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio,* 780 F.3d at 636 (citing SSR 96-8p). The Ruling further explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (citing SSR 96-8p).

Social Security Ruling 85-16 provides additional instruction for the evaluation of mental impairments that may affect a claimant's ability to perform substantial gainful activity ("SGA"), but do not meet the severity of a medical listing at step three. SSR 85-16, at *1. For these less severe mental impairments, the ALJ may not presume that the claimant is, or is not, capable of engaging in SGA. *Id.* Instead, the mental impairments' effects on the claimant "must be demonstrated through a detailed assessment of the individual's capacity to perform and sustain mental activities which are critical to work performance." *Id.*

"Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio,* 780 F.3d at 636

(quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).  In *Mascio*, the ALJ neglected to discuss the claimant's ability to perform certain functions for a full workday — a troubling omission in light of conflicting evidence in the record.  *Id.* at 637.  The Fourth Circuit remanded, because the ALJ's opinion lacked the analysis required for a meaningful review and left the court "guess[ing] about how the ALJ arrived at her conclusion . . . ."  *Id.* at 636-37.

An ALJ satisfies *Mascio* by "providing a detailed discussion of Plaintiff's capacity for concentration, persistence, or pace."  *See Thomas v. Colvin*, 2016 WL 1070826, at *4 (E.D. Va. Mar. 16, 2016) (finding *Mascio* satisfied because substantial evidence supported the RFC, and finding no inconsistency in the ALJ's assessment of the plaintiff's concentration, persistence or pace limitations); *Mitchell v. Colvin*, 2015 WL 5690899, at *5-7 (W.D. Va. Sept. 28, 2015) (distinguishing *Mascio*, because the ALJ relied on medical evidence to support his conclusion and did not summarily conclude that a limitation of simple, unskilled work accounted for the plaintiff's moderate impairment in concentration, persistence and pace); *St. Clair v. Colvin*, 2015 WL 5310777, at *6 (W.D. Va. Sept. 11, 2015) (an RFC assessment relying on medical opinion evidence that the plaintiff could "perform simple and repetitive tasks and maintain regular attendance in the work place," despite having moderate impairment in concentration, satisfied *Mascio*).

These cases establish that *Mascio* did not create a *per se* rule that a plaintiff's moderate impairment in concentration, persistence or pace must always translates into an RFC limitation.  Rather, *Mascio* highlighted the ALJ's duty to review the evidence and explain his decision when the claimant has moderate limitations in concentration, persistence or pace.  780 F.3d at 638.

### 1. The ALJ's Discussion of Plaintiff's Moderate Limitations in Concentration, Persistence and Pace Satisfied *Mascio.*

At step three, the ALJ found that Plaintiff had moderate limitations in maintaining concentration, persistence and pace. (R. at 21.) In support of this finding, the ALJ noted that although Plaintiff had difficulty concentrating, completing tasks and handling stress, she could prepare simple meals, shop in stores and online, manage her own finances and regularly attend church. (R. at 21.) The ALJ also cited Dr. Jadali's November 2014 consultative examination notes, which described Plaintiff as alert, oriented to person, place and time, with logical thought processes. (R. at 24.) The ALJ then discussed 2014 and 2015 treatment records from Southside CSC showing mildly increased psychomotor activity, as well as fair attention and concentration with no hallucinations, delusions or paranoia. (R. at 21.)

In Plaintiff's RFC assessment, the ALJ limited Plaintiff to simple, routine, and repetitive tasks for two hours at a time, while making simple work-related decisions. (R at 22.) The ALJ further restricted Plaintiff to rare changes (no more than ten percent) in the general nature of the work setting or tasks performed. (R. at 22.) Finally, the ALJ limited Plaintiff to no more than occasional interaction with the public, co-workers and supervisors. (R. at 22.)

Discussing the evidence supporting the RFC, the ALJ acknowledged Plaintiff's treatment records documenting signs of depression, anxiety, Plaintiff's tearful affect, irritability, increased psychomotor activity and rapid and loud speech. (R. at 24.) However, the ALJ also noted that treatment records showed that Plaintiff demonstrated fair insight and judgment, fair attention and concentration, adequate fund of knowledge, grossly intact short-term and long-term memory and only mildly increased psychomotor activity, as well as mildly rapid and loud speech. (R. at 24 (citing medical records from May 2015, July 2014 and January 2015).) The ALJ went on to discuss treatment records noting Plaintiff's "pleasant and cooperative behavior, appropriate

24

memory skills" and ability to follow commands.  (R. at 24 (citing October 2014 examination).)
Next, the ALJ noted that Plaintiff displayed a normal mood and affect, normal speech and a
logical thought process during her consultative examination with Dr. Jadali in November 2014.
(R. at 24.)  And the ALJ cited Plaintiff's more recent treatment records from December 2015,
October 2016 and November 2016, describing Plaintiff's cooperative behavior and appropriate
mood and affect.  (R. at 24.)  Finally, the ALJ noted that despite Plaintiff's allegedly disabling
symptoms, she maintained independent living with minimal assistance.  (R. at 24.)

      In discussing the opinion evidence related to Plaintiff's mental impairments, the ALJ
gave great weight to the state agency medical psychologists — Stephen P. Saxby, Ph.D., and
Joseph Leizer, Ph.D. — who both found Plaintiff "capable of understanding and remembering
simple one-two step instructions and following repetitive tasks in an environment with limited
personal interaction."  (R. at 26, 92-93, 96, 105, 108-10.)  The ALJ afforded these opinions great
weight, because both Drs. Saxby and Leizer are board-certified psychologists with specialized
knowledge of the Social Security disability program.[7]  (R. at 26.)  The ALJ also noted that the
state agency psychologists' opinions comported with Plaintiff's psychiatric treatment records
from Southside CSB.  (R. at 26; *see* R. at 409, 455 (records from Southside CSB describing
Plaintiff's normal memory and fair attention and concentration).)

      In contrast, the ALJ only afforded little weight to Global Assessment Function ("GAF")
scores, which indicated mild to serious difficulty in functioning.  (R. at 26.)  Treatment providers

---

[7]     State agency medical consultants are highly qualified physicians who are experts in
Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering
the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he
would for any other medical opinion. § 404.1513a(b)(1). Unless the ALJ gives controlling
weight to a treating source's opinion, the ALJ is required to explain the weight given to state
agency opinions. § 404.1527(e); *see also* § 404.1513a (setting forth rules applied to state agency
medical and psychological consultants).

at Southside CSB assigned Plaintiff GAF scores ranging from 45 to 65 in May 2014, July 2014 and January 2015.  (R. at 26.)  The ALJ discounted these scores, because they represented a mere "snap shot" of Plaintiff at any given moment, and the scores "vary from day to day . . . and from practitioner to practitioner."  (R. at 26.)  Moreover, the ALJ discounted Plaintiff's scores, because they lacked consistency with Dr. Jadali's November 2014 consultative examination, during which Plaintiff appeared alert and oriented, with a normal mood and affect and logical thought processes, as well as Plaintiff's reported activities, including her ability to shop, drive, prepare simple meals, attend church and manage her finances.  (R. at 26, 244-48, 450.)

Consistent with *Mascio*, the ALJ engaged in a detailed discussion regarding Plaintiff's moderate limitations in concentration, persistence and pace.  After considering, *inter alia*, Plaintiff's testimony, medical records, activities of daily living, GAF scores and the opinions of the state agency psychologists, the ALJ appropriately limited Plaintiff to simple, routine and repetitive tasks for two hours at a time, making simple work-related decisions, with rare changes in the nature of the work setting and tasks performed, as well as limited interaction with others. (R at 22-27.)

Plaintiff argues that these limitations still do not account for Plaintiff's ability to stay on task.  (Pl.'s Mem. at 16-17.)  This Court previously held that an ALJ appropriately accounts for a claimant's moderate limitations in concentration, persistence and pace — and specifically the ability to stay on task — when the ALJ restricts the claimant to simple routine, repetitive tasks for fixed periods of time.  *See Fowler v. Colvin*, 2015 WL 8488971, at *7 (E.D. Va. Oct. 13, 2015), *report and recommendation adopted*, 2015 WL 8484443 (E.D. Va. Dec. 9, 2015) ("Though [the ALJ] did not explicitly use the terms "pace" or "persistence" in the limitations, the ALJ properly included Plaintiff's psychological deficiencies in the hypothetical posed to the VE .

. . [by describing] a worker who could not work more than two hours at a time without a break."); *Baskerville v. Colvin*, 2015 WL 5786488, at \*13, n.6 (E.D. Va. Sept. 30, 2015), *report and recommendation adopted*, 2015 WL 5786488, at \*1 (finding that *Mascio* had "no effect" on case where ALJ found plaintiff could perform simple, repetitive tasks and "sustain concentration towards such tasks for two-hour segments").  Other courts have similarly found that including this type of time-specific limitation accounts for a claimant's ability to stay on task; and, therefore, complies with *Mascio*. *See Cochran v. Berryhill*, 2018 WL 3122438, at \*6 (D. Md. June 26, 2018) (limiting plaintiff to "simple tasks in two-hour increments with 10- to 15-minute breaks in-between"); *Gill v. Berryhill*, 2018 WL 2107196, at \*4 (W.D.N.C. May 7, 2018) (finding that plaintiff had "ability to stay on task [for] two hours at a time"); *Roope v. Berryhill*, 2017 WL 1364603, at \*3 (W.D.N.C. Apr. 13, 2017) ("An explanation of how long a claimant is able to sustain concentration and attention to perform tasks is a direct accounting for the claimant's ability to stay on task — and difficulties in concentration, persistence and pace."); *Fender v. Berryhill*, 2018 WL 1536485, at \*7 (W.D.N.C. Mar. 29, 2018) ("[T]he Court finds that a two-hour limitation directly addresses Plaintiff's moderate limitations in concentration, persistence or pace[.]" ); *Beckman v. Comm'r, Soc. Sec. Admin.*, 2017 WL 1316920, at \*3 (D. Md. Apr. 7, 2017) (limiting plaintiff to multi-step tasks for two-hour segments "or within customary work tolerances, with breaks" satisfied *Mascio*).

"Not only have other courts reached this conclusion, but this two-hour limitation closely resembles the effects of limiting a claimant to a non-production pace, which also adequately addresses moderate difficulties in [concentration, persistence and pace]." *Fender*, 2018 WL 1536485, at \*7 (citing *Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017) (additional citations omitted)).  Indeed, in *Sizemore*, the Fourth Circuit held that an ALJ appropriately accounted for

the plaintiff's moderate limitations in concentration, persistence and pace — including the ability to stay on task — by limiting the plaintiff to simple one-step and two-step tasks "in low stress non-production jobs with no public contact." 878 F.3d at 81. Because substantial evidence in the record, including the opinion of the state agency psychologist and another doctor, showed that the plaintiff could perform work on a sustained basis despite his moderate limitations in concentration, persistence and pace, the Fourth Circuit affirmed the ALJ's decision. *Id.*

Consistent with the above precedent, the Court finds that the ALJ appropriately accounted for Plaintiff's ability to stay on task by limiting her to simple, routine and repetitive tasks for two hours at a time, making simple work-related decisions, with rare changes in the nature of work and tasks performed, as well as limited interaction with the public, co-workers and supervisors. (R at 22.)

### 2. Substantial Evidence Supports the ALJ's Decision.

Plaintiff's medical records and the opinions of the state agency psychologists support the ALJ's mental RFC assessment. In 2012, Plaintiff attended counseling sessions at Southside CSB pursuant to an order from the Mecklenburg Department of Social Services. (R. at 399.) During her counseling sessions, Plaintiff reported experiencing "relationship problems, depression, and conflict with [her] children." (R. at 399.) Tessie Sadler, LCSW, noted in Plaintiff's discharge summary that Plaintiff completed her counseling on May 9, 2012, and "was doing well" at that time. (R. at 399.) Sadler reported that Plaintiff successfully completed her treatment, which consisted of outpatient mental health services, therapy, medication management and crisis services as needed. (R. at 399.)

Nurse Warden completed a physical for Plaintiff in February 2014. During the examination, Plaintiff appeared oriented to time, place and person, displayed normal judgement

28

and insight, normal mood and affect, and normal memory. (R. at 310.) Nurse Warden checked boxes indicating that Plaintiff appeared anxious and depressed, with no suicidal attempts or ideations. (R. at 312.)

In May 2014, Plaintiff presented to Southside CSB, requesting services for major depressive/bipolar disorder. (R. at 401.) Plaintiff reported difficulty with short-term memory and complained of lack of interest, continual crying, inability to sleep, nightmares, racing thoughts, irritability, anxiety and feeling continually tired. (R. at 401, 403.) Otherwise, Plaintiff's mental status examination yielded unremarkable results. (R. at 404.) Plaintiff appeared well groomed and alert with appropriate affect and attitude, average judgment and insight, and she displayed no psychotic-like or antisocial behavior. (R. at 404.) A social worker assessed Plaintiff as suffering from bipolar disorder and referred her to a physician to complete a more thorough assessment of Plaintiff's psychiatric needs. (R. at 404, 408.)

On June 5, 2014, Plaintiff presented to Manjit Vohra, M.D., at Southside CSB for a psychological evaluation. (R. at 409.) Dr. Vohra observed mildly increased psychomotor activity and described Plaintiff's speech rate, rhythm and volume as "mildly rapid and loud." (R. at 411.) Although Plaintiff displayed a depressed, tearful mood with matching affect, she appeared alert, oriented and cooperative, had fair insight and judgment, fair attention and concentration, and grossly intact short-term and long-term memory. (R. at 411.) Plaintiff denied hallucinations and suicidal and homicidal ideations. (R. at 411.) Dr. Vohra diagnosed Plaintiff with bipolar disorder and moderate depression, and prescribed Cymbalta. (R. at 411-12.)

On October 26, 2014, Plaintiff presented to Community Memorial Hospital for chest pain. (R. at 470.) Although Plaintiff appeared anxious, treating staff described her as alert and in no acute distress with normal mental status. (R. at 474.) During a follow-up consultation the

following day, Plaintiff denied experiencing insomnia, crying, depression, stress, anxiety or suicidal feelings. (R. at 480.) Dr. Denlinger described Plaintiff as alert, pleasant and cooperative. (R. at 481.) On November 4, 2014, Dr. Jadali found Plaintiff positive for depression and anxiety; however, on mental status examination, Plaintiff appeared alert and oriented, with a normal mood and affect and logical thought processes. (R. at 450-51.) In December and January 2014, Plaintiff presented to Community Memorial Hospital, complaining of wrist and shoulder pain following a fall. (R. at 460-65.) During both visits, Plaintiff appeared alert and oriented to person, place and time. (R. at 461, 464-65.)

Plaintiff returned to Southside CSB for a medication review and psychiatric follow-up on January 14, 2015. (R. at 455.) Sabeen Riaz, M.D., noted that Plaintiff exhibited mildly increased psychomotor activity, a mildly rapid and loud speech rate, a depressed mood and tearful affect. (R. at 455.) However, Plaintiff appeared alert and oriented, denied suicidal and homicidal ideations, and she displayed grossly intact short-term and long-term memory, fair attention and concentration, and fair judgment and insight. (R. at 455.) Plaintiff reported that her depression worsened due to marital issues. (R. at 455.) Dr. Riaz prescribed a trial of Wellbutrin to address Plaintiff's mood. (R. at 455.)

On December 1, 2015, and October 7, 2016, Plaintiff presented to Dr. Williams at Commonwealth Neuro Specialists. (R. at 504, 509.) During both visits, Dr. Williams described Plaintiff as alert, oriented, cooperative and non-suicidal, with an appropriate mood and affect. (R. at 508, 512.) On November 7, 2016, Plaintiff returned to Dr. Williams, who made the same neurologic and psychiatric findings as the previous two appointments. (R. at 508, 512, 552, 555.) These treatment records show that, although Plaintiff sometimes displayed increased psychomotor activity and a depressed or tearful mood and affect, her mental status examinations

30

yielded largely normal results, including an alert, oriented and cooperative attitude, normal memory, and fair attention and concentration. (R. at 310-12, 401-04, 455, 461, 464-65, 508, 512, 555.)

The state agency psychologists both observed that Plaintiff experienced ongoing pain and that her symptoms of depression would moderately affect her interactions with others. (R. at 93, 109.) Accordingly, Drs. Saxby and Leizer recommended that Plaintiff would benefit from a work environment where she could perform "fairly independent of others." (R. at 93, 109.) The state agency psychologists also found Plaintiff moderately limited in her ability to understand and remember detailed instructions, but opined that Plaintiff could follow simple one-to-two-step instructions. (R. at 92, 108.) The ALJ appropriately afforded these opinions great weight, noting the state agency psychologists' expertise and consistency of their opinions with treatment records from Southside CSB, discussed above. (R. at 26.)

Plaintiff's largely normal mental status examination, coupled with the opinions of the state agency psychologists' opinions constitute substantial evidence supporting the ALJ's mental RFC assessment. Accordingly, the ALJ did not err.

### 3. The ALJ's Hypothetical to the VE Likewise Accounted for Plaintiff's Moderate Limitations in Concentration, Persistence and Pace.

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, he can perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(f). The Commissioner can carry her burden at the final step with the testimony of a VE. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). During the VE's testimony, the ALJ must pose hypothetical questions that accurately represent the claimant's RFC based on all of the record evidence and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing

in the national economy that the claimant can perform. *Id.* Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*; *Hines v. Barnhart*, 453 F.3d 559, 567 (4th Cir. 2006) (finding that the VE's testimony had no value, because he did not take all of the claimant's impairments into account); *see also Mascio*, 780 F.3d at 638 (remanding because hypothetical did not account for plaintiff's moderate limitations in concentration, persistence and pace).

As discussed above, the ALJ's RFC assessment adequately accounted for Plaintiff's moderate limitations in concentration, persistence and pace. During the hearing, the ALJ posed a hypothetical to the VE that mirrored Plaintiff's RFC, including the limitations related to performing simple, routine and repetitive tasks for two hours at a time, making simple work-related decisions, with rare changes in the nature of the work setting and tasks performed, and with occasional interaction with the public, co-workers and supervisors. (R. at 64.) The VE responded that such an individual could perform work existing in the national economy, including work as a hand packer, addresser and sorter/inspector. (R. at 65.) Because the ALJ's hypothetical to the VE mirrored the RFC, the ALJ's hypothetical likewise accounted for Plaintiff's moderate limitations in concentration, persistence and pace.

### C. The ALJ Did Not Err in Assessing Plaintiff's Mental Impairments.

Next, Plaintiff argues that the ALJ failed to give appropriate consideration to evidence pertaining to Plaintiff's mental limitations when formulating Plaintiff's RFC. (Pl.'s Mem. at 13-14.) Defendant responds that the ALJ's opinion "included a fair summary of Plaintiff's minimal mental health treatment" and that the ALJ reasonably considered all of the evidence. (Def.'s Mem. at 19-20.)

The Fourth Circuit has recognized that "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.'" *Woodbury v. Colvin*, 213 F. Supp. 3d 773, 778 (D.S.C. 2016) (quoting *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005))). Instead, when "[t]he Commissioner, through the ALJ and Appeals Council, [has] stated that the whole record was considered, . . . absent evidence to the contrary, we take her at her word." *Reid*, 769 F.3d at 865 (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)). In *Reid*, the plaintiff argued that the ALJ failed to mention objective findings that supported his claim. *Id.* The Fourth Circuit rejected this argument, finding that the ALJ considered the entire record, discussed treatment notes from the disputed time period, and that the plaintiff had "failed to point to *any* specific piece of evidence . . . that might have changed the outcome of his disability claim." *Id.* Where the ALJ "sufficiently bridges [her] conclusions with the evidence in dispute," failure to address that particular evidence does not warrant remand. *Woodbury*, 213 F. Supp. 3d at 779 (internal quotation marks and additional citation omitted).

Plaintiff argues that the ALJ failed to consider the severity of Plaintiff's depression and should have acknowledged statements that Plaintiff made in June and July 2014 about staying in bed and wanting to disappear, as well as the "continual crying and continual fatigue" that Plaintiff displayed in April 2014. (Pl.'s Mem. at 13 (citing R. at 401, 409, 413).) Although the ALJ did not cite those instances, he did acknowledge that Plaintiff's treatment records showed signs of depression, anxiety, tearful affect and irritability. (R. at 24.) Despite those findings, the ALJ explained that Plaintiff had normal mental status examinations in her more recent treatment records. (R. at 24.) Indeed, in December 2015, October 2016 and November 2016, Dr. Williams

described Plaintiff as alert, oriented, cooperative and non-suicidal, with an appropriate mood and affect. (R. at 508, 512, 555.)

Lastly, Plaintiff argues that the ALJ failed to properly assess a January 4, 2017 letter from Dr. Bailey, in which he described Plaintiff as "a very troubled young woman with significant psychiatric disease and multiple limiting medical issues." (Pl.'s Mem. at 14 (citing R. at 557.) Dr. Bailey also opined that Plaintiff's prospects of finding and maintaining gainful employment were "very poor." (R. at 557.) The ALJ appropriately gave this opinion little weight, because the opinion failed to discuss Plaintiff's functional capabilities; rather, Dr. Bailey opined on the ultimate issue of disability, which the ALJ correctly noted is reserved to the Commissioner. (R. at 25); *see* § 404.1527(d)(1) (explaining that opinions on issues reserved to the Commissioner, including whether a claimant is disabled, does not constitute a medical opinion).

Because Plaintiff failed to identify a single piece of evidence omitted from the ALJ's discussion of her mental impairments that would have changed the ALJ's decision, the Court finds that her argument lacks merit. The ALJ gave sufficient discussion and consideration to all of the evidence relating to Plaintiff's mental impairments.

### D. The ALJ's Failure to Conduct a Function-by-Function Analysis Requires Remand.

Laslty, Plaintiff argues that the ALJ failed to conduct a function-by-function analysis before assessing Plaintiff's RFC, thereby failing to address Plaintiff's ability to sit, stand and walk during the workday, as well as Plaintiff's ability to occasionally stoop, kneel, crouch and crawl. (Pl.'s Mem. at 9-10.) Defendant argues that substantial evidence supports the RFC, despite the lack of an explicit function-by-function analysis. (Def.'s Mem. at 12-17.)

As discussed above, Social Security Ruling 96-8p requires the RFC assessment to identify the individual's functional limitations or restrictions and assess her work-related abilities "on a function-by-function basis, including the functions listed in the regulations." *Mascio,* 780 F.3d at 636.   The ALJ's failure to conduct a function-by-function analysis does not necessarily result in remand. The Fourth Circuit rejected a "*per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." *Mascio,* 780 F.3d at 636.   Indeed, in light of *Mascio,* district courts have found that in the absence of an explicit function-by-function analysis, the reviewing court "must assess whether the ALJ's RFC analysis considered the relevant functions, whether his decision provides a sufficient basis to review his conclusions, and, ultimately, whether substantial evidence in the record supports that decision." *Ashby v. Colvin,* 2015 WL 1481625, at *3, *7 (S.D. W. Va. March 31, 2015) (holding that ALJ did not conduct explicit function-by-function analysis of claimant's physical abilities, but sufficient evidence existed showing that ALJ analyzed the relevant function); *see also Scruggs v. Colvin,* 2015 WL 2250890, at *4-5 (W.D.N.C. May 13, 2015) (requiring remand because ALJ's decision did not address claimant's ability to complete tasks for a full workday); *Carver v. Colvin,* 2015 WL 4077466, at *10 (M.D.N.C. July 6, 2015) (recommending remand because ALJ neglected to assess claimant's ability to walk or stand for a full workday).

Here, Plaintiff takes issue with the ALJ's failure to make an explicit finding as to how long Plaintiff can sit, stand and walk during a workday. (Pl.'s Mem. at 9-10.) The RFC included no finding as to how long Plaintiff could perform these functions, but the ALJ's opinion discussed evidence showing that physical therapy improved Plaintiff's ability to ambulate and the lack of evidence demonstrating that Plaintiff medically requires an assistive device. (R. at

23.) The ALJ also mentioned Plaintiff's ability to sit, stand and walk in his evaluation of the opinion evidence. (R. at 24-25.) First, the ALJ afforded state agency medical consultant Richard Surrusco, M.D., great weight. (R. at 24.) At the reconsideration level, Dr. Surrusco found Plaintiff capable of sitting for six hours and standing or walking for two hours during an eight-hour workday. (R. at 24, 107.) The ALJ afforded this opinion great weight, based on Dr. Surrusco's specialized knowledge of the Social Security disability program, and because his "well-explained" opinion comported with the recorded as a whole. (R. at 24.)

Next, the ALJ afforded partial weight to the opinion of state agency physician Wyatt S. Beazley, M.D., who evaluated Plaintiff at the initial level and found Plaintiff capable of sitting, standing and walking for six hours during an eight-hour work day. (R. at 25, 90-91.) The ALJ likewise afforded partial weight to Dr. Jadali's consultative examination, which found that Plaintiff could sit and walk for four hours and stand for six hours in an eight-hour workday. (R. at 25, 451-52.) Lastly, the ALJ afforded little weight to the opinion of Dr. Monteiro, who opined that Plaintiff could stand, walk and sit for only four hours of the workday. (R. at 25.)

The Fourth Circuit has rejected the notion that an ALJ satisfies the function-by-function analysis "by referencing a properly conducted analysis by a state agency consultant." *Woods v. Colvin*, 2017 WL 1196467, at *4 (W.D.N.C. Feb. 8, 2017), *report and recommendation adopted sub nom. Woods v. Berryhill*, 2017 WL 1190920 (W.D.N.C. Mar. 29, 2017), *vacated and remanded*, 888 F.3d 686, 694 (4th Cir. 2018). The lower court in *Woods* held that the ALJ's failure to conduct a function-by-function analysis of the plaintiff's ability to sit, stand, walk, reach, etc., did not require remand, because the ALJ discussed contradictory evidence in the record, considered "the analysis of the state agency consultants" and afforded those decisions great weight. 2017 WL 1196467, at *4 (finding that ALJ satisfied SSR 96-8p). The Fourth

36

Circuit disagreed. Although the ALJ "summarized evidence that he found credible, useful, and consistent[,] . . . the ALJ never explained how he concluded — *based on this evidence* — that Woods could actually perform the tasks required by 'medium work,' such as lifting up to 50 pounds at a time, frequently lifting or carrying up to 25 pounds, or standing or walking for six hours." *Woods*, 888 F.3d at 694.

Thus, although the ALJ here discussed opinion evidence regarding Plaintiff's ability to sit, stand and walk during an eight-hour workday, as well as contradictory evidence in the record, his opinion failed to "build an accurate and logical bridge" between that evidence and his conclusions. (R. at 24-25); *Woods*, 888 F.3d at 694 (citing *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)) (additional citation omitted). The ALJ's failure to make any finding as to how long Plaintiff can sit, stand or walk during the workday, coupled with his failure to link his discussion of the evidence to his conclusions about Plaintiff's ability to perform those functions, requires remand.

Lastly, Plaintiff argues that the ALJ failed to provide a narrative discussion supporting his conclusion that Plaintiff can occasionally balance, stoop, kneel, crouch and crawl. (Pl.'s Mem. at 10.) Specifically, Plaintiff argues that the she suffers from greater postural limitations than the ALJ opined, due to her back and knee pain and limited range of motion in both places. (Pl.'s Mem. at 10.) In his discussion of the medical evidence, the ALJ acknowledged treatment records showing that Plaintiff had decreased range of motion in the right knee and spine but then cited more recent treatment records from VCU Health Systems showing that Plaintiff had a normal range of motion, motor strength and sensation in the upper and lower extremities. (R. at 23.) The ALJ also noted that images of Plaintiff's right knee and lumbar spine showed only "minimal medial compartment

joint pace narrowing" and "mild central disc bulging." (R. at 23.) But again, the ALJ failed to link his discussion of this evidence to support his conclusion that Plaintiff can occasionally balance, stoop, kneel, crouch and crawl. Although the ALJ afforded great weight to the opinion of Dr. Surrusco, who likewise found that Plaintiff could occasionally perform those functions, the Fourth Circuit made clear in *Woods* that an ALJ's reliance on a state agency assessment does not supplant his duty to explain his decision and link the evidence to his conclusions. (R. at 24, 107); *Woods*, 888 F.3d at 694. Accordingly, the ALJ's lack of explanation requires remand.

V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment and Motion to Remand (ECF Nos. 10, 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 13) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Let the clerk forward a copy of this Report and Recommendation to United States District Judge John A. Gibney, Jr. and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

by the District Judge except upon grounds of plain error.

                                         /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 15, 2019

39